**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LETRAN TRAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-450 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| MINNESOTA LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LeTran Tran ("Plaintiff") brings this action against Defendant Minnesota Life Insurance Company ("Defendant") seeking payment of Accidental Death and Dismemberment ("AD&D") benefits under an employee welfare benefit plan ("Plan") established by AbbVie Inc. and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Currently before the Court are Plaintiff's motion for summary judgment [17] and Defendant's motion for entry of judgment [18]. For the reasons explained below, Plaintiff's motion [17] is granted and Defendant's motion [18] is denied. Final judgment will be entered in favor of Plaintiff and against Defendant.

## I.      Background

The parties have agreed to adjudication by the Court based on review of the paper Administrative Record. See [13], [14]. The parties also agree that the relevant facts are not in dispute. The Court takes the following facts from the Administrative Record, as described in the parties' Local Rule 56.1 statements. See [17-1], [20], [21], [22]. The facts set forth in this section also constitute the Court's findings of fact pursuant to Rule 52(a). See Fed. R. Civ. P. 52(a).

Defendant is an insurance company duly licensed to write insurance policies in the State of Illinois. AbbVie Inc. established the Plan, which provides life insurance coverage and AD&D coverage. Minnesota Life is the Plan's insurer for life insurance coverage for Basic Insurance under Group Term Life Policy, Policy Number 34092-G (the "Basic Group Policy") and Supplemental Insurance under Group Term Life Policy No. 34093-G (the "Supplemental Group Policy") issued to AbbVie (collectively, the "Group Policies"). The coverage provided under the Plan included AD&D coverage as described in the Accidental Death and Dismemberment Policy Rider to each of the Group Policies. The AD&D Policy Rider to each of the Group Policies states:

**What does this rider provide?**

This rider provides a benefit for an insured's accidental death or dismemberment which occurs as a result of an accidental injury.
…

**What does accidental death or dismemberment by accidental injury mean?**

Accidental death or dismemberment by accidental injury as use in this supplement means that the insured's death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

[22] at 3.

Further, the AD&D Policy Rider to the Basic Group Policy specifies that "In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberment results from or is caused directly by any of the following … (5) suicide or attempted suicide or other self-inflicted injuries, or (8) other non-accidental causes." [22] at 4. Likewise, the AD&D Policy Rider to the Supplemental Group Policy specifies that "In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberment results from or is caused directly by any of the following: (1) suicide or

attempted suicide, whether sane or insane; or (2) intentionally self-inflicted injury or any attempt at self-inflicted injury, whether sane or insane." *Id*. The AD&D Rider to each Group Policy also states, "We will pay the accidental death and dismemberment benefit upon receipt at our home office of written proof satisfactory to us that the insured died or suffered dismemberment as a result of an accidental injury." *Id*. at 3.

Plaintiff's husband, Linno Llenos ("Llenos") was a covered participant under the Basic Group Policy and the Supplemental Group Policy. Plaintiff is the primary beneficiary of Llenos under the Group Policies. Llenos died on August 9, 2016. That evening around 7:00 p.m., Officer Folkerts of the Wilmette Police Department was dispatched to Llenos' and Plaintiff's residence "for suicide by hanging." [22] at 4. Plaintiff met Officer Folkes at the front door and stated that her husband was in the basement and had hung himself. Officer Folkerts went to the basement where he found Llenos hanging from the rafters with a towel and rope around his neck. Llenos had his left foot resting on a stool while his right leg was hanging approximately 4 to 5 inches off the basement floor. There appeared to be no signs of life.

Lauren M. Woertz, MD, Assistant Medical Examiner, performed the post-mortem examination on August 10, 2016. Dr. Woertz's report states, in part:

<u>Diagnoses</u>

1.      Asphyxia due to hanging, autoerotic in nature.

       A.      A towel was over the skin of the anterior neck, but under the rope ligature wrapped around the decedent's head and chin.

       B.      [T]he rope ligature hangs in loops in front of the decedent's chest, possibly representing a release mechanism for the decedent during the asphyxia event.

       C.      Four rubber rings were around the decedent's genitals, the pubic hair was shaved in a semi-circular pattern consistent with prior use of the rubber rings.

D.    Per the scene photographs, the decedent's left foot is resting on top of a step stool, the right foot is suspended above the floor. (Social history).

E.    No history of depression or prior suicidal ideation.

Opinion

In consideration of the circumstances surrounding his death, the available social history, and the external examination of the body, the cause of death of this 56-year-old, Asian male, LINNO LLENOS, is due to asphyxia resulting from hanging. The asphyxia event appears to be autoerotic in nature.

MANNER OF DEATH: Accident.

[21] at 6.

Llenos' Certificate of Death identifies the "Immediate Cause of Death" as "asphyxia" and "hanging." The "Manner of Death" is listed as "accident." [21] at 7. The description of "how the injury occurred" states "autoerotic asphyxia."

On August 10, 2016, Officers Neubauer and Trage of the Wilmette Police Department met with Tran. Officer Neubauer's case narrative states in part:

Sgt. Trage and I responded to and met with Tran. I advised Tran that the M.E.'s office was investigating her husband's death as accidental and not suicide. Tran appeared visibly relieved by the news. She told me the following in summary: She stated that Llenos was sad about his mother's death in 2014, but not to the point where he was suicidal. She also stated the family's financial situation was secure. She did not know why Llenos would commit suicide and agreed it was possible he died during an auto-erotic asphyxiation accident.

[22] at 7.

At the time of his death, Llenos had Basic Life and Supplemental Life Insurance coverage under the Group Policies in a total amount of $517,000, Basic AD&D coverage of $10,000 under the Basic Group Policy, and Supplemental AD&D coverage of $50,000 under the Supplemental Group Policy. Plaintiff is the beneficiary of Llenos' Plan coverage.

On August 26, 2016, Plaintiff made a claim under the Group Policies. Defendant acknowledged receipt of the claim. On September 1, 2016, Defendant paid Tran the $517,000

benefits plus interest for Llenos' Basic Life and Supplemental Life coverage under the Plan. Defendant denied Plaintiff's claim for $60,000 in AD&D coverage.

On September 20, 2016, Defendant sought a medical opinion from Dr. Maryam Shapland regarding the cause and manner of death. On September 27, 2016, Dr. Shapland responded:

> Summary: From the records provided here, the claimant died from autoerotic asphyxiation. Death occurs from loss of consciousness, leading to control and inability to reverse or stop the means of strangulation. From the police and the ME report, the claimant appeared to have had measures available to him to protect himself from strangulation, including a towel, foot resting on step stool, and a possible release mechanism with the rope. Therefore, it is reasonable to conclude that the claimant had loss of consciousness during this episode of autoerotic asphyxiation and was unable to reverse/stop the means of strangulation, thus leading to his death. The information here is consistent with and supportive of the cause and manner of death as noted on the death certificate.

On October 7, 2016, Dr. Shapland opined:

> Medical literature documents that autoerotic asphyxia is an activity where one chokes oneself during sexual stimulation in order to heighten sexual pleasure. It typically involves bindings around the neck to asphyxiate. Decreased oxygenation to the brain (cerebral hypoxia) occurs in three ways: (1) compression of the trachea and carotid arteries causes decreased air flow to the lungs and blood flow to the brain; (2) compression of the carotid sinus can cause a vagal response, which reduces cerebral oxygenation through reflex bradycardia and vasodilation; and (3) increased intrathoracic pressure decreases cardiac output. When pressure is released, there may be a 'high' related to the rush of blood and oxygen to the brain.

> Acute to severe hypoxia can cause loss of consciousness in 10-20 seconds, permanent brain damage in 3 minutes, and death in 4-5 minutes. Less severe hypoxia can cause drowsiness, impaired judgment, excitement, disorientation and headache. Injuries found in strangulation include bruising on the neck, blood shot eyes, and petechiae on the face or conjunctivae, while complications include coma, seizures, stroke, and brain damage.

[22] at 7-8.

Defendant notified plaintiff by letter dated November 14, 2016, that her claim was denied. The letter states:

This letter is regarding the life insurance claim submitted on behalf of Linno Llenos ... We have completed our review of the claim and determined that we are unable to pay the accidental death benefits. The following will explain this decision.

The applicable policy provision for policy #34092 states:

**"What does accidental death or dismemberment by accidental injury mean?**

Accidental death or dismemberment by accidental injury as used in this rider means that the insured's death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberment results from or is caused directly by any of the following:

(5) suicide or attempted suicide or other self-inflicted injures; or ****"

The applicable policy provision for policy #34093 states:

**"What does accidental death or dismemberment by accidental injury mean?**

Accidental death or dismemberment by accidental injury as used in this rider means that the insured's death or dismemberment results, directly and independently of disease or bodily infirmity, from an accidental injury which is unexpected and unforeseen.

In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberments results from or is caused directly by any of the following:

(2) intentionally self-inflicted injury or any attempt at self-inflicted injury, whether sane or insane; or ****"

According to the death certificate, the cause of death was asphyxia resulting from hanging during an autoerotic event. The reports received state he was found unresponsive at home and the evidence showed he intentionally put a rope around his neck to cut off the air flow to the lungs and blood flow to the brain, resulting in lost consciousness leading to death.

Since his death resulted from a self-inflicted injury, the exclusions above apply and we are unable to pay the accidental death proceeds. Furthermore, the cause of death does not meet the definition of an accidental injury which is unexpected or unforeseen as death during this type of event is foreseeable.

Although the death certificate lists the death as 'accidental,' the death was not an 'accidental death' as defined in the policies and the policies specifically exclude this type of event.

[22] at 8-9.

Defendant's letter advised Plaintiff of her rights to appeal and that she had 60 days from the date of notification to appeal Defendant's decision.

Plaintiff appealed Defendant's denial of her claim by letter dated December 2, 2016. She enclosed copies of the Certificate of Death and Postmortem Report, but no additional evidence. In her letter, Plaintiff wrote, in part:

As the documents demonstrate, there is no dispute that the death was an accidental event. Mr. Llenos did not commit or attempt suicide, and did not intend or attempt to self-inflict injury to himself. He was engaged in an activity which was pleasurable to him when an unfortunate accident occurred. Although perhaps more unusual, autoerotic asphyxiation is no different than sky-diving, motorcycle riding, or sailing, in that they are activities people take part in for enjoyment, but which may conceivably lead to their death in the event of accident.

[21] at 9.

Defendant consulted Dr. Gretchen Bosacker to evaluate Plaintiff's appeal. On December 15, 2016, Dr. Bosacker explained that practitioners of autoerotic asphyxia "intentionally induce transitory anoxia to enhance sexual arousal, an extremely risky and life-threatening practice."

On December 15, 2016, Dr. Bosacker opined regarding autoerotic asphyxia:

The most common mechanism by which sexual arousal is obtained (accounting for 70-80% of the deaths) is by constriction of the neck by a ligature. One of the features used to diagnose autoerotic death is the presence of a fail-safe device at the scene that can be used to free the practitioner from the device used to induce asphyxia. Many of these devices fail and unconsciousness develops rapidly. The risk of death is high because the practitioner is alone and unconscious.

[22] at 10.

By letter dated January 25, 2017, Defendant affirmed its denial of Plaintiff's claim.

Defendant's letter states:

> We have completed our review of this claim and your letter appealing our denial of the Accidental Death benefits on behalf of Linno Llenos. We did not receive any new medical information from you to review and consider. Based on the terms of the policy, in addition to the police and Medical Examiner reports received during our initial review, we must affirm our denial of these benefits.
>
> Accidental death as defined in the policies must result "from an accidental injury which is unexpected and unforeseen." The injury in autoerotic asphyxiation of constricting blood flow to the brain is not unexpected or unforeseen but rather the purpose of the autoerotic activity. Based on the above, we have not received sufficient proof that Mr. Llenos' death is the result of an accidental injury as defined in the policy.
>
> Although the Medical Examiner determined the manner of death to be "accident," we must administer the claim in accordance with the terms of the policies. Mr. Llenos' death is not an "accidental death" as defined in the policies.
>
> The self-inflicted injury of intentionally constricting blood flow to the brain distinguishes autoerotic activity from the other avocation examples listed in your letter of appeal. None of the other activities mentioned in your letter (skydiving, motorcycle riding, or sailing) involve intentionally interrupting an essential bodily function.
>
> In addition, these policies specifically exclude payment of benefits if the death results from or is caused by: "*(5) suicide or attempted suicide or other self-inflicted injuries;…*" for policy 34092; and "*(2) intentionally self-inflicted injury or any attempt at self-inflicted injury, whether sane or insane;*" for policy 34093. Therefore, the accidental death benefits are not payable.

[21] at 10-11.

On February 7, 2017, plaintiff filed an Amended Complaint alleging a claim under section 502(a) of ERISA to recover accidental death benefits under the Basic Group Policy and Supplemental Group Policy.

## II.    Legal Standards

Defendant moves for judgment pursuant to Rule 52(a), while Plaintiff moves for summary judgment pursuant to Rule 56.  Rule 52(a) governs actions "tried on the facts without a

jury," and requires the Court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). This rule "allows the Court to conduct a trial on the papers and to resolve factual disputes." *Halley v. Aetna Life Insurance Co*., 141 F. Supp. 3d 855, 857 (N.D. Ill. 2015). By contrast, judgment under Rule 56(a) is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court will treat both parties' motions as motions for judgment pursuant to Rule 52(a). Although Plaintiff filed her motion under Rule 56, she does not argue that deciding the case under Rule 52(a) would be inappropriate, and the parties have stipulated that the case should be decided based on the administrative record. The Seventh Circuit has "has suggested that Rule 52(a) is the applicable standard of review in an ERISA case where"—as they have here—"the parties have stipulated to facts that made up the administrative record and the 'procedure ... [is] more akin to a bench trial than to a summary judgment ruling.'" *Paulus v. Isola USA Corp. Retirement Plan*, 2014 WL 462367, at *1 (W.D. Wis. Feb. 5, 2014) (quoting *Hess v. Hartford Life & Accident Insurance Co*., 274 F.3d 456, 461 (7th Cir. 2001)). A "trial on the papers" under Rule 52(a) "offers certain advantages over cross-motions for summary judgment," including that "[i]t is certain to result in a decision for one party rather than present the risk of a non-decision if the cross-motions for summary judgment are both denied." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003).

## III.    Analysis

In this ERISA case, the parties agree that the Court's review of the Plan administrator's decision is *de novo*, which means that the Court "'must come to an independent decision on both the legal and factual issues that form the basis of [Plaintiff's] claim.'" *Marantz v. Permanente*

*Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012) (quoting *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007)).[1]  The relevant facts are not in dispute, as the parties agree that the Court's adjudication should be based on review of the paper Administrative Record, [13], [14], and also have not identified any disputes of material fact that need to be resolved.

The Court's decision of legal issues must, "[o]f course," be based on "the terms of the insurance policy."  *Zaccone v. Standard Life Ins. Co.*, 36 F. Supp. 3d 781, 783 (N.D. Ill. 2014). "Because the Plan is governed by ERISA, federal common law principles of contract interpretation apply."  *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 632 (7th Cir. 2010) (citing *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996)).  "Those principles require that Plan terms be interpreted in 'an ordinary and popular sense, as [they] would [be understood by] a person of average intelligence and experience.'"  *Id.* (quoting *Cannon v. Wittek Cos., Int'l*, 60 F.3d 1282, 1284 (7th Cir. 1995)); see also *Sellers*, 627 F.3d at 632.  Any ambiguities are construed in favor of the insured.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).  Plan language is ambiguous when it is "'subject to more than one reasonable interpretation.'"  *Id.* (quoting *Life Ins. Co. of N. Am. v. Von Valtier*, 116 F.3d 279, 283 (7th Cir. 1997)).  Plaintiff bears the burden of proving she is entitled to the benefits of the insurance coverage, while Defendant bears the burden of establishing Plaintiff's lack of entitlement because of a policy exclusion.  *Id.*

There is no dispute that Plaintiff is the beneficiary of Llenos' Group Policies.  Nor is there any dispute over the cause of Plaintiff's death.  The undisputed evidence establishes that

---

[1] By contrast, when "the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, judicial review of the administrator's decision to deny benefits is limited to the arbitrary-and-capricious standard."  *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (internal quotation marks and citation omitted).

Llenos died from asphyxia by hanging during autoerotic activity, and that Llenos did not intend for death to result. According to Dr. Shapland, it was reasonable to conclude that Llenos had a loss of consciousness during an episode of autoerotic asphyxiation and was unable to reverse or stop the means of strangulation, leading to his death.

The only dispute is whether the Group Policies' exclusions for death that "results from or is caused directly by … self-inflicted injury[ies]" applies to Plaintiff's claim for AD&D coverage. Plaintiff argues that, from the point of view of an ordinary person of average intelligence and experience, Mr. Llenos was engaging in activity that he found pleasurable, not intentionally injuring himself or attempting to injury himself, and therefore the policy exclusion for self-inflicted injury does not apply. Defendant does not dispute that Llenos' death was accidental. However, Defendant argues, the purpose of Llenos' self-strangulation was to induce cerebral hypoxia, and that injury—the cerebral hypoxia—was intentionally self-inflicted and resulted in his loss of consciousness and death. Therefore, Defendant maintains, the "injury" that resulted in Llenos' death was not an "accidental injury which is unexpected and unforeseen," and the policy exclusion for self-inflicted injury applies.

To resolve this dispute, the Court must determine whether, under the specific facts of this case, cerebral hypoxia should be considered an "injury" as that term is used in the Group Policies. There are a handful of out-of-circuit cases in which the federal courts have examined this issue from the same procedural posture—*de novo* review applying federal common law. The Court finds these cases instructive and discusses them below. Before turning to them, however, the Court looks to *Santaella* for the Seventh Circuit's insight on what the term "intentionally inflicted injury" means in "the ordinary and popular sense, in the way that a person

of average intelligence and experience would interpret the terms." 123 F.3d at 463 (quoting *Von Valtier*, 116 F.3d at 283) .

In *Santaella*, the court of appeals addressed whether an insurance policy exclusion that absolved the insurer from liability where the insured's "death was the result of an 'intentionally inflicted injury'" applied where the insured died as a result of "ingest[ing] a lethal amount of the pain reliever propoxyphene." 123 F.3d at 463. The policy in that case did not define "accident," "injury," or "intentionally self-inflicted." *Id*. at 460. The record showed that the deceased insured "had an enlarged spleen and lymph system, discovered by [a doctor] during the autopsy, and that she possibly suffered a seizure two months before her death." *Id*. at 463. "On the basis of this record, the district court decided that a reasonable person in [the insured's] situation would have considered her seizure a serious physical injury and, in making the decision to take the drugs, would have assumed that the seizure was causally related to the use of drugs and further would have assumed that taking the dosage created the probability of death or serious injury." *Id*. at 463.

On appeal, the Seventh Circuit interpreted the undefined term "accidental" in the "ordinary and popular sense" to mean "unexpected or unintentional." *Santaella*, 123 F.3d at 462. The Court explained that while it is "customary to look at the casualty from the point of view of the insured," where "the evidence is not sufficient to ascertain with certainty the subjective expectation or intent of the decedent, an objective reasonable person standard must be employed to determine the insured's expectation." *Id*. at 462-63. The court then cited approvingly to the Fifth Circuit's "methodology for analyzing whether a death was accidental":

> [F]or death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the insured's conduct.

*Id*. at 463 (quoting *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995)).

Applying this standard, the court of appeals concluded that the district court had "erred in [its] analysis." *Santaella*, 123 F.3d at 463. The Seventh Circuit rejected the district court's "characterization of [the insured's] ingestion of propoxyphene as a purposeful infliction of injury on herself," because "nothing in the record indicate[d] that she intended to take an overdose or that she intended to inflict injury on herself," or that she "knew or should have known that she had a damaged spleen and lymph glands or that the seizure she suffered might be related to an abuse of drugs." *Id*. "Without some evidence that she was aware of the risk of serious injury or death," the Court explained, "we must conclude that [the insurer] did not die from an intentionally self-inflicted injury and thus that the exclusion did not bar her claim." *Id*.

*Santaella* was cited approvingly by the Ninth Circuit in *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2001), which like this case involved the application of an accidental death policy's "intentionally self-inflicted injury" exclusion to a death resulting from autoerotic asphyxiation. *Id*. at 1124. In *Padfield*, the insured tied a necktie around his neck and sniffed an industrial solvent to "produce[] a state of hypercapnia (an increase in carbon dioxide in the blood) and a concomitant state of hypoxia (a decrease in oxygen in the blood)," lost consciousness, and died by strangulation. *Id*. at 1123-25. The insured's policy contained the following exclusion: "This Policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, ... suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury." *Id*. at 1124. The court determined that an injury is "unexpected" and "unintentional" when (1) the insured "subjectively lacked an expectation of death or injury"; and (2) from an objective perspective, a "reasonable person, with background and characteristics similar to the insured, would have viewed the

resulting injury or death as substantially certain to result from the insured's conduct."  *Id*. at 1126.

The Ninth Circuit explained that the resolution of the coverage dispute "hinge[d] on whether the physical consequences that [the insured] intended were injuries," because "[i]f they were injuries, and they led to his death, then the exclusion applies, and [the insurer] correctly denied benefits."  *Padfield*, 290 F.3d at 1129.  The court determined based on the record that, if all had gone as the insured planned, "he would have experienced a temporal deprivation of oxygen, a euphoric light-headedness from the exposure to the industrial solvent, and an intensified sexual experience."  *Id*.  "His oxygen level would then have been restored, his euphoric state would have subsided, and he would have returned home uninjured."  *Id*.  The court held that "[n]one of these consequences is an 'injury' as that term is defined in the ordinary and popular sense [by] person[s] of average intelligence and experience."  *Id*. (internal citation and quotation marks omitted).  And the injuries that the insured suffered as a result of his plans going awry—the necktie tightening and injuring the tissue of his neck and leaving a visible mark, his blood flow being cut off for a sustained period, and his death from a lack of oxygen—were not "intentionally self-inflicted," because the evidence showed that the insured had no subjective intent to cause them.  *Id*.  Finally, the court concluded that "the suppositions underlying [the insured's] subjective intent were objectively reasonable," because "[a] reasonable person with background and characteristics similar to [the insured's] would not have viewed the strangulation injury that resulted in his death as 'substantially certain' to result from his conduct."  *Id*. (quoting *Todd*, 47 F.3d at 1456).

The Ninth Circuit found the case to be "analytically identical to *Santaella*, in that the insured "voluntarily engaged in actions that led to a fatal injury, but his reasonable expectation

was that this behavior would not have resulted in 'injury' as that word is commonly defined." *Padfield*, 290 F.3d at 1130. The insured, "having performed the act in the past without inflicting any injury, had a reasonable expectation that he would be able to do so again," and therefore "'did not die from an intentionally self-inflicted injury'" but instead "made a 'fatal mistake.'" *Id*. (quoting *Santaella*, 123 F.3d at 465).

In a similar case, *Critchlow v. First Unum Life Ins. Co. of America*, 378 F.3d 246 (2d Cir. 2004), the Second Circuit was tasked with determining whether an exclusion from an AD&D policy for "loss … caused by … intentionally self-inflicted injuries" applied to a claim arising out of the insured's death by autoerotic asphyxiation. *Id*. at 250. Like the court in *Padfield*, the Second Circuit examined whether the insured had a reasonable expectation to survive, such that his death could be considered an accident, and whether that expectation was reasonable. *Id.* at 259 ("we ask, first, whether Critchlow subjectively lacked an expectation of death or injury, and second, if so, whether the suppositions that underlay that expectation were reasonable from Critchlow's perspective, taking into account, *inter alia,* his own personal characteristics and experiences"). The Second Circuit held that the exclusion did not apply, rejecting the insurer's argument that "partial strangulation is an injury in and of itself." *Id*. The court explained that the insurer's argument "ignored the apparently well-accepted medical and scientific views that the physiological effects of partial strangulation without loss of consciousness—absent an accident—are a temporary lightheadedness and euphoria with no serious or lasting adverse impact on one's health, and that autoerotic asphyxiation is not likely to result in death." *Id*.

Defendant cites to four district court decisions applying federal common law in which autoerotic asphyxiation was found to be a purposely self-inflicted injury. In *Cronin v. Zurich American Ins. Co*., 189 F. Supp. 2d 29 (S.D.N.Y. 2002), the court construed an exclusion for

"any claim that is caused by, contributed to, or results from … [a] purposely self-inflicted injury." *Id*. at 32.  The court held on *de novo* review that the insured's death by strangulation while engaging in autoerotic asphyxiation was "purposely self-inflicted injury" where the insured used a luggage strap to exert pressure on the arteries of his neck to restrict blood flow. The court determined that "[a] reasonably intelligent person would conclude that the 'purposely self-inflicted injury exclusion' applies to situations where the policyholder causes a wrong to the integrity of his own body to cause himself 'suffering or mischief willfully and unjustly inflicted.'" *Id*. at 39 (citing OXFORD ENGLISH DICTIONARY ONLINE).  Although the insured "may not have intended to cause himself *permanent* injury," the court explained, "his intention to restrict the flow of blood and oxygen to his brain in order to impair his mental processes was a 'hurt' to his physical and mental being, and risked death." *Id*. at 40.

In *Bryant v. AIG Life Ins. Co.*, 2002 WL 34504617 (W.D. Mich. Nov. 27, 2002), the court cited approvingly to *Cronin* and held on *de novo* review that "the partial strangulation involved in autoerotic asphyxiation comes within the plain meaning of 'intentionally self-inflicted injury.'" *Id*. at *5.  The *Bryant* court asserts that it is joining "the overwhelming majority of federal courts in concluding that the partial strangulation involved in autoerotic asphyxiation comes within the plain meaning of 'intentionally self-inflicted injury.'" *Id*. at *5. These cases, cited in *Bryant* as constituting the "overwhelming majority" view, include *Cronin*; the district court decision in *Chritchlow*, which was subsequently reversed by the Second Circuit; two cases in which an abuse of discretion standard was applied, *Hamilton v. ATIG Life Ins. Co*., 182 F. Supp. 2d 39 (D.D.C. 2002), and *Fawcett v. Metropolitan Life Ins. Co*., 2000 WL 979994 (S.D. Ohio June 28, 2000); *Lonergan v. Reliance Standard Life Ins. Co.,* 1997 U.S. Dist. LEXIS 24075 (D. Mass. May 29, 1997), which did apply the *de novo* standard but involved a decedent

who hanged himself from the ceiling without any safety mechanism; and two non-ERISA cases decided under state law, *Sims v. Monumental Gen'l Ins. Co.*, 960 F.2d 478, 480-81 (5th Cir. 1992), and *Sigler v. Mutual Benefit Life Ins. Co.*, 506 F. Supp. 542, 545 (S.D. Iowa 1981).

The third case that Defendant cites, *Bond v. Ecolab, Inc*., 2007 WL 551595 (E.D. Mich. Feb. 21, 2007), applied the abuse of discretion standard in reviewing the insurer's denial of coverage under an accidental death policy. The policy there excluded coverage for a loss "if it in any way results from, or is caused or contributed by ... injuring oneself on purpose." *Id*. at *2. The court concluded based on evidence that the insured intentionally restricted the flow of oxygen to his brain that the insurer's reading of the self-inflicted injury provision was "not unreasonable in light of the Plan's language," and explained that "the fact that reasonable minds may differ on the interpretation of the exclusion only supports the reasonableness of the [insurer's] decision." *Id*. at *6.

Defendant's fourth case, *Fawcett v. Metro. Life Ins. Co*., 2000 WL 979994 (S.D. Ohio June 28, 2000), also applied an abuse of discretion standard. *Id*. at *1 n.5. The policy there excluded coverage for any loss that "results from, or is caused or contributed to by ... injuring oneself on purpose[.]" *Id*. at *2. As in *Bond*, the court concluded that "[t]he possibility that reasonable minds may differ on this issue"—whether the act "of restricting the flow of oxygen to [the] brain constitute[s] an intentionally self-inflicted injury"—merely confirms that [the insurer] did not act arbitrarily and capriciously in making its decision" to apply a self-inflicted injury exclusion to deny coverage where the insured died of autoerotic asphyxiation. *Id*. at *7.

Review of the foregoing federal common law convinces the Court that reasonable minds could disagree about whether Llenos' intentional induction of cerebral hypoxia is, in and of itself, a self-inflicted injury under the facts of this case. From Llenos' subjective perspective,

there is no evidence that he intended to injure himself. Unlike the decedent in *Lonegran*, who hung himself from his basement ceiling with no safety mechanism, the medical examiner's report showed that Llenos appeared to have had measures available to him to protect himself from strangulation, including a towel, a foot resting on a step stool, and a possible release mechanism with the rope. There is also evidence that Llenos had engaged in this activity before and survived, namely his pubic hair was shaved in a semi-circular pattern consistent with prior use of the rubber rings that were found around his genitals after he died.

Similarly, from the objective perspective of a "reasonable person in his situation," *Santaella*, 123 F.3d at 463, the Court concludes that reasonable minds could differ on whether the term "injury" as used in the Group Policies includes Llenos' induction of cerebral hypoxia under the facts of this case. The facts of *Padfield* and *Critchlow* are quite similar, and the Court sees no obvious flaws in the Ninth Circuit's and Second Circuit's analyses. Further, multiple federal cases applying the abuse of discretion standard, including the *Bond* and *Fawcett* cases relied on by Defendant, recognize that reasonable minds may disagree over whether induced cerebral hypoxia is a self-inflicted injury. See *Bond*, 2007 WL 551595, at *6; *Fawcett*, 2000 WL 979994, at *7; *Clarke v. Federal Ins. Co.*, 823 F. Supp. 2d 1213, 1220–21 (W.D. Okla. 2011). In cases where the abuse of discretion standard applies, "[t]he fact that courts and experts disagree over whether ... a constriction of oxygen to the brain due to the practice of autoerotic asphyxiation is an intentional self-inflicted injury or not … supports the conclusion that [the insurer's] decision [to deny coverage] was reasonable." *Id.* (internal citation and quotation marks omitted). But here, the Court must conduct a *de novo* review and resolve any ambiguities in the Group Policies' exclusions in favor of coverage. *Santaella*, 123 F.3d at 461. In this case, the medical examiner's report explains that hypoxia, when induced to an extent that does not

cause loss of consciousness, can cause drowsiness, impaired judgment, excitement, disorientation, and headache. Reasonable minds could disagree on whether these results are, in and of themselves, "injuries." Of course, if hypoxia lasts too long, it can result in loss of consciousness; however, there is no evidence in the record that Llenos intended to lose consciousness.

Attempting to "partially" strangle oneself might, of course, seem like a bad idea to the ordinary person. But just because an activity is risky does not necessarily mean that it is injurious. As the split in case law in the context of autoerotic asphyxiation shows, it is difficult to say where the line should be drawn. Take, for instance, a swimmer who challenges himself to swim underwater for longer and longer periods, and ends up holding his breath too long, blacking out, and dying. Was the swimmer injuring himself intentionally by holding his breath, since that temporarily deprived his brain of oxygen? Defendant analogizes Llenos' death to a person shooting himself in the foot (an intentional injury), passing out from the pain, and dying of blood loss: although the death was accidental, the injury was intentional. But reasonable minds most likely would agree that a gunshot wound is an injury, whereas they may disagree about whether reducing oxygen to the brain for a few seconds is an injury. This is not to say that an injury must be permanent in order to constitute an injury. But reasonable minds could find some bodily harms to be too temporary or minor to be considered injuries.

This is not the end of the Court's analysis, however. Even if hypoxia is not an injury itself when "properly" done, when it is not properly done and it results in loss of consciousness and strangulation, it obviously becomes an injury at some point. Therefore, the Court must also examine whether Llenos' strangulation, which resulted after he lost consciousness, is "an accidental injury which [w]as unexpected and unforeseen." [8] at 22 (quoting the Plan).

According to *Santaella*, a death is "unexpected" (*i.e.* "accidental") from the objective perspective "'if death is not *substantially certain* to result from the insured's conduct.'"  123 F.3d at 463 (quoting *Todd*, 47 F.3d at 1456) (emphasis added).  Similarly, in *Padfield*, an injury or death is "unexpected" from the objective perspective unless "a "reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as *substantially certain* to result from the insured's conduct."  290 F.3d at 1126.  These cases (and the other federal common law cases cited by the parties) do not explore the meaning of the term "unforeseen" and whether it differs from "unexpected."  The parties do not distinguish between the two terms, either.  Black's Law Dictionary defines "unforeseen" as "[n]ot foreseen; not expected."  BLACK'S LAW DICTIONARY (10th ed. 2014).  From this analysis the Court concludes that a reasonable person could treat the two terms interchangeably, such that an injury is unexpected and unforeseen unless it is substantially certain to result from the insured's conduct.

In this case, the Court cannot say that Plaintiff's loss of consciousness and strangulation were substantially certain to result from his conduct.  Although the practice of autoerotic asphyxiation is undoubtedly risky, Plaintiff had engaged (and many others do engage) in the practice without losing consciousness, strangling themselves, or dying.  Further, Defendant does not dispute that Llenos' death was accidental.  Since Plaintiff's loss of consciousness and resultant strangling were the direct cause of his death, Defendant cannot logically argue that these results were substantially certain to result from his conduct, while at the same time conceding that Plaintiff did not intend to kill himself.

For these reasons, the Court holds that people of reasonable intelligence could conclude that (1) Llenos' intentionally-induced cerebral hypoxia was not an intentional injury as that term is used in the Group Policies; and (2) Llenos' death resulted from "an accidental injury which

[wa]s unexpected and unforeseen." This does not mean that these are the only conclusions that people of reasonable intelligence could reach. But since any ambiguities in the Plan must be construed in favor of coverage, the Court is compelled to conclude that the exclusions for intentional injuries do not apply and Defendant should not have denied coverage.

## IV.      Conclusion

For the reasons explained above, the Court grants Plaintiff's motion for summary judgment [17], denies Defendant's motion for judgment under Rule 52(a), and enters judgment in favor of Plaintiff pursuant to Rule 52(a). Final judgment will be entered in favor of Plaintiff and against Defendant.

Dated: March 5, 2018

_____
Robert M. Dow, Jr.
United States District Judge